## CARNEY *v.* McGILVRAY.

(Division A. Oct. 15, 1928. Suggestion of Error Overruled Dec. 10, 1928.)

[119 So. 157. No. 27248.]

88

---

*Corpus Juris-Cyc. References: Breach of Marriage Promise, 9CJ, section 77, p. 359, n. 12; section 87, p. 363, n. 60; section 88, p. 366, n. 83; p. 369, n. 91, 96. On proof of bad character in mitigation of damages, in action for breach of promise to marry, see annotation in 41 L. R. A. (N. S.) 849; 4 R. C. L. 173.

*R. L. Bullard,* for appellant.

*John R. Tally* and *Stevens & Heidelberg,* for appellee.

McGowen, J.   Mrs. Cordelia Carney sued Duncan McGilvray in the circuit court of Forrest county on a breach of contract—his failure to carry out a promise of marriage.

The defendant pleaded the general issue, and gave notice thereunder that on the trial he would undertake to prove that she did not in good faith expect to marry him and become his wife, and perform the duties of a wife to her husband; that she (the plaintiff) was under the impression that he (the defendant) was a man of wealth; that she knew he was old, and believed he had only a short time to live, and sought to inveigle him into a marriage with her, in order to secure the property which she believed him to own; that, in furtherance of her designs, she tried to lead the defendant to believe that she was a good woman, of good moral character, and of good reputation for morality and chastity; a woman of modesty and proper sense of propriety; that he soon learned that the plaintiff had been making disrespectful remarks about him to her neighbors and acquaintances; that it was not true that she was a woman of modesty and a proper sense of propriety, nor was it true that she had a good reputation for modesty and chastity; that after he learned these things he ceased his relations with her.

At the close of plaintiff's testimony, plaintiff demanded of the defendant a bill of particulars, on the idea that

notice under the general issue charged the plaintiff with unchastity.

Upon an order of the court the defendant responded, and, in a written bill of particulars, specifically denied that there was an allegation under the general issue that the plaintiff was guilty of unchastity, but renewed his statement that she was not a woman of modesty and did not have a proper sense of propriety. To substantiate this latter allegation he made the following specific charges: First, that during the fall of the year 1926 she and a man by the name of Earl Brown lived alone in the same house for some time; second, that during the year 1926, after the death of her husband, men were frequently seen to drive up near her house, and that she and such men would go down under the hill and into the woods, where they would stay for some time; third, that after suit was filed plaintiff wrote a letter to Joe J. Blackwell, seeking a clandestine engagement with him; and, fourth, that in the month of November, 1926, plaintiff and Earl Brown made a two-day trip together.

The case was submitted to the jury, and a verdict was rendered in favor of defendant. Plaintiff in the court below, Mrs. Carney, prosecutes an appeal here.

The appellant assigns as error the refusal of the court below to grant her a peremptory instruction to the effect that there was a promise of marriage, and a breach thereof, and submitting only to the jury the question of the amount of damages sustained by her.

According to the testimony of the plaintiff and her witnesses, there was a positive and unequivocal contract of marriage, to be fulfilled on her birthday, May 10, 1927.

It is not our purpose to review the evidence in this case and set it out at length, but we shall only restate that which is necessary to an understanding of this opinion.

The parties to this suit were people who lived in the country. Mrs. Carney had a small farm and a country store in connection therewith. Sometimes she lived at her home near the store, and sometimes she lived at the

home of a neighbor, until Mr. McGilvray bought a home in the city of Gulfport to which she moved and lived for some time, and where she (Mrs. Carney) understood they were to be married, and live ever happily thereafter.

Her testimony as to the courtship and engagement is strongly supported by the love letters written by Mr. McGilvray to her. These letters evince affection, and are signed "Lovingly yours." They were written from Hattiesburg, and in all save the last one he announced his intention of returning to Gulfport, and assured her that he "would soon be down," until finally, about the latter part of June, 1927, he wrote her a letter in which he used this expression:

"Well, Mrs. Carney, i don't kno how to answer your letter. I am not well, and badly torn up and bothered in mind. I had mutch rather suffer my self than to caus any one else trouble, you go on and do what you think best for yourself. I dont kno what is best to do except to pray and leave the whole matter with the Lord. Respectfully yours," etc.

Mrs. Carney testified that this letter was in response to a letter written by her, asking when he was coming down to be joined in holy wedlock with her.

Mrs. Carney further testified that, on their first trip to Gulfport to purchase the house into which she later moved, he asked her when would be her next birthday, and that she told him May 10th, to which he replied, "On that date I am going to give you a birthday present, to-wit, myself," and that she accepted, and acceded to this declaration in all good faith.

The defendant's testimony, in substance, is a denial that he ever asked her to marry him, or that he ever agreed to marry her; but he does say that on one occasion, when he went to her store, he asked her if she ever expected to take another companion, and that she replied that she would have to consult her daughter in New York, that her daughter was furnishing her a home, and that

she would not marry without her daughter's consent; and that later, in response to his inquiry, she said that her daughter was opposed to her marrying, and that she would not consider doing so.

The effect of defendant's testimony is that Mrs. Carney (who was fifty-nine years of age, and the defendant sixty-nine) was the aggressor in the love-making (which he reluctantly admitted, in some degree, took place). In his testimony he pictures himself as a very reluctant and unwilling Adonis to Mrs. Carney's assumed rôle and pose of Venus, as portrayed in Shakespeare's account of that love scene between the Goddess of Love and the handsome, but cold and unyielding, Adonis. He says she put her arms about his neck and kissed him, and then, being somewhat warmed, he repaid the kiss.

Upon the whole, there was perhaps enough evidence in denial of the promise of marriage to submit the question to the jury as to whether or not there was such a contract.

It is next assigned as error that the court erroneously gave the following instruction:

"The court instructs the jury for the defendant that, even if you should believe that the defendant at one time was courting the plaintiff, and even if you should believe that he at one time asked her to marry him, yet if you further believe from the evidence that at that time the defendant believed that the plaintiff was a modest, chaste woman with proper sense of propriety, and if you further believe from the evidence that thereafter he obtained information, which was true, that she was not such modest woman and did not have such sense of propriety, and if you further believe from the evidence that her conduct, as shown by the evidence, was sufficiently immodest and wrongful as to relieve him from carrying out his agreement made under such false impression, then it is your duty to find for the defendant, provided you further be-

lieve from the evidence that such conduct was fraudulently concealed from defendant.''

This instruction did not furnish the jury with- any guide; it left the jury to their individual opinions as to what the jury considered ''immodest and wrongful,'' and whether it was of such magnitude as to relieve the defendant of his obligation.

In the first place McGilvray bottomed his defense on the proposition that there was never any contract of marriage, and says that he never made any investigation of Mrs. Carney's standing among her neighbors until she sued him for breach of promise.

The only evidence upon which the court could have based this instruction was to the effect that Mrs. Carney did have a hired man by the name of Brown, who lived in her home for about two months, and that a young lady school-teacher boarded with her at the same time; that she (Mrs. Carney) left her home, accompanied by Brown, who was to drive her, on a certain morning, and said she was going to Gulfport, and would return that night. She did not return that night or the next day, and not until about eight o'clock the next evening. This created some talk in the neighborhood, and aroused the indignation of the young schoolmistress. But we are not permitted— and neither was the jury—to impute evil motives to a woman who drove from Hattiesburg to Gulfport, and from Gulfport to Mobile, in an effort to sell some property, attended only by a chauffeur, or hired man, or even a prospective sweetheart. There is no evidence that anything improper occurred on the trip. So the instruction could not have been based on this evidence.

Vince Runnels, a neighbor of Mrs. Carney, testified that he saw her, on a dozen different occasions, leave the house with some man, usually on Sunday afternoon, and go down under the hill some distance into a thick woods, and that sometimes it would be an hour before they returned; that he did not know who the man was, nor

whether it was the same man who accompanied her on these different occasions. He stated that he did not think this was proper conduct, but that Mrs. Carney was a good neighbor, and that he could not say but that she was a good woman. This witness was eighty years of age. They left the house where Runnels could not see within and went into the open where they could be seen, so this incident imputes no unchastity, and, at the most, is only sufficient to raise suspicion.

The defendant testified that he heard of the trip to Mobile with Brown and asked her about it, and she told him she went there on business connected with the sale of some property, and that he thought her explanation a reasonable one. There is no showing here that she ever concealed anything from him, except it could be said that she did not voluntarily tell him of the instance above detailed by Mr. Runnels, which instance we do not think shows her to be unchaste.

There was a letter written by plaintiff to a married man by the name of Blackwell, in which she asked him to meet her at a place she owned on a certain street in Hattiesburg, and suggested to him that he not show himself to the neighbors. This letter is, perhaps, the strongest indictment that could be urged against Mrs. Carney as an unchaste woman; but she says she expected to have others there at work, and did not want to be talked about by the neighbors, that she wanted to discuss with Blackwell a business transaction. So no immorality or unchastity could be attached to the letter, because there is nothing in the letter that would lead one to believe that the meeting was for other than lawful purposes.

Taking all the evidence that was permitted by the court to go to the jury, and properly so, we think, in mitigation of damages, but not as a defense to the action, it does not show unchaste character on her part, nor circumstances from which unchastity could be reasonably deduced by a jury. See 9 C. J. 337, section 29, and authorities there cited.

Counsel for appellee insist that they were warranted in getting this instruction from the court on the authority of the case of *Espy* v. *Jones,* 37 Ala. 379, wherein a woman who had been seduced sued for a breach of promise of marriage, and damages aggravated by the seduction of the plaintiff by the defendant. The court there held that if a man promises to marry a woman, whom he believes to be virtuous and modest, and afterwards, discovers that she is loose and immodest, he is justified in breaking his promise; provided that was the reason for breaking it, and provided he did not know she was loose and immodest when he made the promise.

There is quite a difference in the expression "loose and immodest," as compared with the expression "immodest and not having a proper sense of propriety." A "loose and immodest" woman would necessarily be an unchaste woman; but an "immodest woman not having a proper sense of propriety" might be as pure as Mistress Annie Page, when she led Sir John Falstaff into many unpleasant situations—had him thrown into the Thames in a basket of clothes at one time, beaten with sticks at another, and cruelly frightened at another, and all on the idea that he was having clandestine meetings with an unchaste woman for the gratification of his lust.

We think the cases of *Espy* v. *Jones, supra,* and *Berry* v. *Bakeman,* 44 Me. 164, announce only the proposition that if a woman is *loose* and immodest, and the defendant broke his promise on that account, it is a bar to the action. There is no difference in the expression "loose and immodest" and "unchaste," and counsel for appellant stated in his bill of particulars that he did not charge the plaintiff with unchastity. Also see the case of *Colburn* v. *Marble,* 196 Mass. 376, 82 N. E. 28, 124 Am. St. Rep. 561; *Stewart* v. *Smith,* 92 Wis. 76, 65 N. W. 736.

As to whether proof of improper conduct, not amounting to unchastity, should be permitted to be offered in mitigation of damages, the courts of this country are

divided. For instance, the *Massachusetts case, supra,* holds that such testimony is not competent in mitigation of damages. But we are of opinion that conduct of which the defendant did not have knowledge, which is indelicate, immodest, or indecent, though not amounting to actual unchastity, may be, and ought to be, considered by the jury in assessing damages, for the reason that the marital relation is reciprocal in its nature; and, if the defendant should ascertain that his proposed bride is indelicate, immodest, and indecent in her conduct and speech, the probabilities are that the relation to be assumed, would be so unbearable as that the defendant having breached his contract on that account, ought not to suffer so much damages as in a case where he simply violated his obligation and breached his contract without such persuading, moving, mitigating circumstances. See *Palmer* v. *Andrews,* 7 Wend. (N. Y.) 142; *Stewart* v. *Smith,* 92 Wis. 76, 65 N. W. 736; *Stratton* v. *Dole,* 45 Neb. 472, 63 N. W. 875; *Butler* v. *Eschleman,* 18 Ill. 44.

There is another reason why this instruction was improper. There was no evidence of any kind that this plaintiff deceived this defendant in any manner whatever, and, if we understand his testimony, he does not so claim, nor does he claim there was any breach for that reason. He simply says he never promised to marry the woman; that she courted him and that he never consented.

It is next assigned as error that the court erred in granting the defendant the following instruction:

"The court instructs the jury for defendant that in every marriage there are certain wifely duties owed by the woman, and in every contract of marriage the woman, must in good faith intend, if the marriage takes place, to perform such wifely duties. In this case, in order for there to have been a valid marriage contract, the plaintiff must have entered into same in good faith, honestly expecting to perform such wifely duties; and if you believe

from the evidence that she did not in good faith expect to marry the defendant and perform these duties, but that her sole purpose was to obtain what property he might have had, then this in law constituted a fraud and no contract of this kind would be valid and binding."

We have carefully examined this record and find absolutely nothing in it upon which to base this instruction. There is nothing to show that Mrs. Carney would not have discharged every wifely duty which the laws of nature and of society demand of the wife to her husband.

Counsel for appellee call our attention to the fact that on one occasion Mrs. Carney said to a neighbor that Mr. McGilvray "smelled like a wet horse;" that on another occasion she said if she married McGilvray it would be like it was with "Old Carney" (referring to her former deceased husband who had walked with a stick), "Go get my stick;" and that on another occasion she said if she knew he had lots of money and that he would die soon she might consider marrying him.

None of these statements can be distorted into a declaration that she would not faithfully perform her part of the marriage contract; and it is idle and futile to discuss such remarks made by a woman about a man who is showing her attention, as McGilvray was the woman in this case. And there is just as much reason to charge one with desiring money as the other, because McGilvray's ardor cooled when he discovered that Mrs. Carney would not invest any money in the house which he had purchased in Gulfport and to which he permitted her to move, and where, she says, they were to be married, and occupy as their honeymoon home.

There are other questions raised which we do not decide. as they may not arise again; and—

This case must be tried again, because these instructions were fatal as affecting the plaintiff's cause, and were calculated to influence the jury to believe that, even though there was a promise of marriage, it was a good defense if she had been indiscreet but not unchaste; and,

further, that it was a good defense that she made fun of him by saying that if she married him it would be to secure his property, neither of which instructions is supported by the authorities cited here by counsel for appellee, or authorized by the law and evidence in this case.

*Reversed and remanded.*

